UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SARAH GILLMAN,<br><br>Plaintiff,<br><br>v.<br><br>THE LEGAL AID SOCIETY,<br><br>Defendant. | Civil Action No.<br><br>ECF CASE<br><br>JURY TRIAL DEMANDED<br><br>COMPLAINT |

Plaintiff Sarah Gillman ("plaintiff" or "Ms. Gillman"), by way of Complaint against Defendant The Legal Aid Society ("LAS" or "Legal Aid") alleges as follows:

## PARTIES

1. Plaintiff is an individual residing in Brooklyn, New York.

2. Upon information and belief, Legal Aid is a domestic not-for-profit corporation with its principal office located at 199 Water Street, New York, New York 10038-3517.

## JURISDICTION AND VENUE

3. Plaintiff has asserted a claim under pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended ("Title VII"). Because this action arises under the laws of the United States, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

4. On April 9, 2019, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). On August 1, 2019, the EEOC issued plaintiff a

Notice of Right to Sue letter.  Plaintiff has fully complied with the administrative requisites of Title VII and exhausted the administrative remedies provided therein.

5. Supplemental jurisdiction is asserted over plaintiff's state law claim pursuant to 28 U.S.C. § 1367.

6. Pursuant to Section 8–502(c) of the New York City Administrative Code, prior to commencing this action, plaintiff served a copy of this Complaint upon the New York City Commission on Human Rights and the Corporation Counsel.

7. Because Legal Aid resides in this judicial district and/or has contacts with this judicial district which would be sufficient to subject it to personal jurisdiction if this district were a separate state, venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (d).

8. Alternatively, venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**FACTS COMMON TO ALL COUNTS**

9. Ms. Gillman is an attorney licensed to practice law in the State of New York.

10. From 2001 until December 6, 2018, Ms. Gillman worked for the Legal Aid Society ("LAS" or "Legal Aid").

11. At the time of her discharge on December 6, 2018, she was a supervising attorney in the Immigration Unit.

12. In all respects, Ms. Gillman's performance met or exceeded Legal Aid's expectations.

13. Ms. Gillman and her colleague Gregory Copeland achieved several important victories in the cases of Ramon Arevalo Lopez, Danny Michel, Xiu Qing You, and, as discussed infra, Pablo Villavicencio-Calderon.

14. In the case of Danny Michel, the work of Ms. Gillman and Mr. Copeland was featured in two fundraising solicitations sent prior to and after their termination from LAS.

15. Ms. Gillman was also widely lauded for her mentoring of attorneys and students both within and outside Legal Aid.

16. On November 6, 2018, only one month prior to her termination, LAS Attorney-in-Charge of the Immigration Law Unit, Hasan Shafiqullah, described Ms. Gillman as "an amazing attorney who cares deeply and passionately about our clients," stating, "I have never doubted that for even a moment."

17. Ms. Gillman's work and her photo were included in a fundraising solicitation from Attorney-in-Charge of the Civil Practice Adriene Holder at the end of November 2018.

18. Moreover, two weeks *after* Ms. Gillman's termination on December 6, 2018, LAS cited to her accomplishments in a fundraising solicitation.

19. On June 9, 2018, Ms. Gillman and Mr. Copeland filed a Writ of Habeas Corpus on behalf of Pablo Villavicencio-Calderon ("Pablo").

20. Ms. Gillman and Mr. Copeland prepared the Writ of Habeas Corpus and request for the stay of Pablo's removal and release from detention on the evening of June 8 and early morning of June 9, 2018.

21. On June 9, 2018, Ms. Gillman and Mr. Copeland appeared before the Honorable Allison J. Nathan in the United States District Court for the Southern District of New York. Ms. Holder and Alfonso David from the Office of Governor Andrew Cuomo were present for the argument.

22. As a result of Ms. Gillman and Mr. Copeland's efforts, the Court enjoined the transfer of Pablo from the New York City area and from the jurisdiction of the New York Field Office of the Office of Enforcement and Removal.

23. The following month, on July 24, 2018, the Court granted the petition for a writ of habeas corpus, permanently staying his removal and ordering Pablo removed from incarceration.

24. Jennifer Williams, LAS Deputy Attorney-In-Charge of the Immigration law Unit, was actively engaged in Pablo's case and attended numerous press conferences with Pablo's wife, Sandra.

25. Ms. Williams developed a friendship with Sandra.

26. On more than one occasion, Ms. Williams communicated with Sandra outside the presence of Pablo.

27. In or about August 2018, LAS assisted Pablo and Sandra with their upcoming interview for the I-130 petition that Sandra had submitted.

28. The following month, in or about September 2018, Ms. Williams advised Sandra to consider divorcing Pablo and withdrawing the I-130 petition.

29. On or about September 12, 2018, Sandra emailed Ms. Williams and wrote, "I don't want that [Pablo] knows what we are talking about."

30. On September 25, 2018, the aforementioned I-130 petition was approved.

31. During the month of September and continuing into October 2018, on more than one occasion, Ms. Williams invited Sandra, her mother and her children—but not Pablo—to her home.

32. On October 19, 2018, Pablo was arrested in connection with an alleged incident the prior day involving Sandra.

33. The following day, October 20, 2018, Ms. Gillman, Mr. Copeland, Ms. Williams and criminal attorney Bruce Barket met at Nassau Criminal Court for Pablo's arraignment.

34. At that time, during a discussion regarding the alleged incident, Ms. Williams responded with what she later acknowledged was an "outburst" and acted in an "unprofessional" manner.

35. After the arraignment, Ms. Williams met with Sandra at her home.

36. On October 20, 2018, Ms. Williams sent a text message to Ms. Gillman and Mr. Copeland stating that she was "out" of Pablo's case.

37. During a subsequent text exchange with Mr. Copeland, Ms. Williams stated, "Best for me to step aside because I'm boxed into a corner between Sandra and Pedro."

38. The following day, on October 21, 2018, Ms. Williams emailed Ms. Gillman and Mr. Copeland.  In her email, she apologized for her "outburst and utter unprofessionalism" and stated that she would "leave Pablo's file in Sarah's office."

39. Notwithstanding this assurance, Ms. Williams continued to involve herself in Pablo's case and also to assist Sandra.

40. The following evening, on October 22, 2018, Ms. Gillman traveled to the Nassau County Jail to meet Pablo, who was being released from custody.

41. At that time, Ms. Gillman spoke with criminal attorney Mr. Barket who stated that he was on a phone call with Ms. Williams and his associate Aida Leisenring "arranging an attorney for Sandra."

42. Two days later, on October 24, 2018, Ms. Williams requested that Ms. Gillman and Mr. Copeland meet with her regarding Pablo's case.

43. At the meeting, Ms. Williams stated that she had felt as though she had been on "Team Sandra" while Ms. Gillman and Mr. Copeland were on "Team Pablo." Mr. Copeland responded that "there is only Team Pablo."

44. Mr. Shafiqullah also attended the meeting. Following the meeting, Mr. Shafiqullah stated that he agreed that there was a problem and apologized to plaintiff and Mr. Copeland for Ms. Williams' conduct, which he described as "unprofessional" and "crazy."

45. During the latter part of October and first week of November 2018, despite several requests, Ms. Williams, Mr. Shafiqullah, Ms. Holder and Attorney-in-Charge of the Criminal Defense Practice Tina Luongo refused to provide Ms. Gillman and Mr. Copeland with the contact information for Sandra's attorney.

46. Ms. Gilman and Mr. Copeland required this information as part of LAS' continued representation of Pablo.

47. On November 5, 2018, Ms. Gillman wrote to Mr. Shafiqullah ("the November 5th Email").

48. In the November 5th Email, she stated that "the work environment [at LAS] as it exists today is abusive and unhealthy"; that "[staff attorneys] Julie [Dona] and Jen Vail and others have been permitted to attack Gregory [Copeland] [and] that Gregory and I have done nothing wrong…"

49. She concluded her email with the following:

I hope when we meet on Wednesday you tell us that Julie has been told enough, that LAS is going to be more supportive of Pablo and responsive to the concerns Gregory and I have raised concerning his case, that moving forward the work environment is going to be different and that on Thursday we can focus on … what really matters: protecting the rights of our clients.

50. On November 8, 2018, Ms. Gillman and Mr. Copeland met with Mr. Shafiqullah and Judith Goldiner, the Attorney-in-Charge of the Civil Law Reform Unit ("the November 8 Meeting").

51. Ms. Williams also attended the November 8 Meeting.

52. During the November 8 Meeting, Ms. Gillman and Mr. Copeland objected on more than one occasion to discussing Pablo's case in Ms. Williams' presence, noting the "serious conflict issues" that LAS had failed to address.

53. In response, Mr. Shafiqullah responded that he did not "think that's a reasonable position to take."

54. During the November 8 Meeting, both Ms. Gillman and Mr. Copeland again noted their objection to LAS' failure to provide Sandra's attorney's contact information as well as Ms. Williams' continued communication with Sandra, who was the complaining witness in Pablo's criminal case.

55. A little less than two weeks later, on November 17, 2018, Ms. Gillman and Mr. Copeland wrote to Ms. Holder, Ms. Luongo, and LAS General Counsel Scott Rosenberg ("the November 17th Email"). The subject line of the November 17th Email was "Request for Assistance".

56. In the November 17th Email, Ms. Gillman stated that she and Mr. Copeland were writing "in the hopes that you will hear what we have been saying over the past month with Pablo's case and what has occurred in the ILU [Immigration Law Unit] in the last number of months."

57. In the November 17th Email, Ms. Gillman expressed her belief that Ms. Williams was "not only unfit to hold her job but ha[d] engaged in unethical behavior that ha[d] been adverse

to our client, Pablo." She further noted that "the behavior of Jennifer Williams was not only inappropriate but had created a hostile work environment for [her] and Gregory."

58. In the November 17th Email, Ms. Gillman further noted that Mr. Shafiqullah and Ms. Williams "ha[d] not only condoned a hostile work environment but have actively contributed to it—in the case of Jennifer Williams—and then sought to retaliate against me and [Mr. Copeland] when we sought to ensure that Pablo's rights and interests were protected."

59. Subsequently, on December 5, 2018, Ms. Gillman again wrote to Ms. Holder and Mr. Rosenberg to complain about "discrimination in the workplace." ("December 5th Email")

60. She noted that she had witnessed Ms. Williams discriminate against Mr. Copeland "in the form of her pursuit and harassment" of him.

61. She also complained about "the ethical violations" relating to Ms. Williams' relationship with Pablo's wife Sandra and requested that "LAS conduct a full investigation and take the appropriate action."

62. The following day, on December 6, 2018, LAS terminated Ms. Gillman and Mr. Copeland's employment.

## FIRST CAUSE OF ACTION
### (Title VII- retaliation)

63. Plaintiff hereby repeats and realleges all of the allegations set forth above as if set forth at length herein.

64. At all relevant times, plaintiff was an "employee" as defined under Title VII, 42 U.S.C. § 2000e(f).

65. At all relevant times, LAS had fifteen or more persons in its employ, and therefore qualified as an "employer" under Title VII, 42 U.S.C. § 2000e(b).

66. As more fully described in paragraphs 9-23, <u>supra</u>, Ms. Gillman was qualified for the position of supervising attorney in LAS' Immigration Unit.

67. On more than one occasion—including without limitation at the November 8 Meeting and in the November 5th Email, the November 17th Email, and the December 5th Email—Ms. Gillman engaged in protected activity under Title VII of which LAS was aware ("the Protected Activity").

68. Ms. Gillman had a good faith, reasonable belief that LAS' actions violated the law.

69. Title VII prohibits employers from "discriminat[ing] against any of its employees ... because [an employee] has opposed any practice made unlawful by Title VII." 42 U.S.C. § 2000e-3(a

70. As evidenced by the fact that, Ms. Gillman was terminated less than three weeks after she complained about the hostile work environment created by Ms. Williams and only a day after she complained about "discrimination in the workplace"—but only one month after Mr. Shafiqullah had lauded her as "an amazing attorney who cares deeply and passionately about our clients"— a causal connection exists between the protected activity and the adverse action

71. As a direct and proximate result of LAS' retaliation, Plaintiff has been damaged.

## SECOND CAUSE OF ACTION
**(New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq. ("NYSHRL")- retaliation)**

72. Plaintiff hereby repeats and realleges all of the allegations set forth above as if set forth at length herein.

73. In taking an adverse employment action against Ms. Gillman, who, as set forth in paragraphs 9-23, <u>supra</u>, was qualified for the position of supervising attorney in LAS' Immigration

Unit, in retaliation for her engaging in the Protected Activity, LAS has acted in violation of the anti-retaliation provision of the New York State Human Rights Law.

74. As a direct and proximate result of LAS' retaliation, Plaintiff has been damaged.

## THIRD CAUSE OF ACTION
### (NYCHRL- retaliation)

75. Plaintiff hereby repeats and realleges all of the allegations set forth above as if set forth at length herein.

76. As a result of plaintiff engaging in the Protected Activity, LAS engaged in conduct that was reasonably likely to deter her from engaging in such action.

77. As a direct and proximate result of LAS' retaliation, Plaintiff has been damaged.

## FOURTH CAUSE OF ACTION
### Claims pursuant to Wieder v. Skala, 80 N.Y.2d 628
### 609 N.E.2d 105 (1992)

78. Plaintiff hereby repeats and realleges all of the allegations set forth above as if set forth at length herein.

79. Pursuant to the holding in Wieder v. Skala, 80 N.Y.2d 628, 593 N.Y.S.2d 752, 609 N.E.2d 105 (1992) and its progeny, a law firm may not discharge an attorney in retaliation for his or her compliance with the rules of professional conduct.

80. The Wieder holding recognized "as an implied term of the employment between an attorney and law firm that both will practice in accordance with New York's disciplinary rules." Joffe v. King & Spalding LLP, 17-CV-3392 (VEC), 2018 WL 2768645, 2018 U.S. Dist. LEXIS 96919, at *24 (S.D.N.Y. June 8, 2018) (citing Wieder, 80 N.Y.2d at 637-38).

81. The New York Rules of Professional Conduct provide that "a lawyer shall not represent a client if a reasonable lawyer would conclude that … there is a significant risk that the

lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests." RPC 1.7(2).

82. Comment 1 to RPC 1.7 notes that "[l]oyalty and independent judgment are essential aspects of a lawyer's relationship with a client. The professional judgment of a lawyer should be exercised, within the bounds of the law, <u>solely</u> for the benefit of the client and free of compromising influences and loyalties." (emphasis added).

83. In addition, a lawyer may not engage in conduct which "is prejudicial to the administration of justice," or which "reflects on the lawyer's fitness as a lawyer." RPC 8.4(d), (h).

84. Ms. Gillman had a reasonable belief that the personal relationship of Ms. Williams and Sandra was affecting the former's ability to represent Pablo in accordance with RPC 1.7.

85. The basis for this belief was the conduct of Ms. Williams and LAS which, as noted <u>supra</u>, included Ms. Williams surreptitiously communicating with Sandra outside Pablo's presence; her advising Sandra to consider divorcing Pablo and withdrawing the I-130 petition; her arranging for a criminal attorney for Sandra notwithstanding that the latter was the complaining witness against Pablo; and LAS' refusal to provide this attorney's contact information to Ms. Gillman and Mr. Copeland.

86. In addition, Ms. Gillman reasonably believed that the aforementioned conduct was prejudicial to the administration of justice and/or adversely reflected on Ms. Williams' fitness as a lawyer.

87. As noted <u>supra</u>, on several occasions—including the November 5th Email, the November 8 Meeting and the November 17th Email as discussed <u>supra</u>—Ms. Gillman voiced her objections to LAS and Ms. Williams' unethical actions.

88. In retaliation for these objections, LAS terminated her employment.

89. The implied-in-law obligation set forth in <u>Wieder</u> prohibited LAS from taking an adverse employment action against Ms. Gillman in retaliation for her insistence that LAS comply with the ethical standards of the legal profession.

90. As a direct and proximate result of LAS' numerous breaches of the implied-in-law obligation set forth in <u>Wieder</u>, plaintiff has been damaged.

**WHEREFORE**, Plaintiff Sarah Gillman demands judgment against Defendant The Legal Aid Society as follows:

A. For the First Cause of Action: (a) compensatory damages; (b) punitive damages; (c) attorneys' fees and costs; (d) prejudgment interest; and (e) such other relief as the Court may deem just and appropriate under the circumstances.

B. For the Second Cause of Action and Third Cause of Action: (a) compensatory damages; (b) punitive damages; (c) attorneys' fees and costs; (d) prejudgment interest of 9% as required under the civil practice law and rules; and (e) such other relief as the Court may deem just and appropriate under the circumstances.

C. For the Fourth Cause of Action, judgment as follows: (a) compensatory damages; (b) attorneys' fees and costs; (c) prejudgment interest of 9% as required under the civil practice law and rules; and (d) such other relief as the Court may deem just and appropriate under the circumstances.

## JURY DEMAND

Plaintiff Sarah Gillman demands trial by jury on all claims and issues so triable.

Dated: Springfield, New Jersey
October 8, 2019

**JAVERBAUM WURGAFT HICKS KAHN WIKSTROM & SININS, P.C.**

By: /s/ Andrew Moskowitz
 Andrew M. Moskowitz, Esq.

505 Morris Avenue
Springfield, NJ 07081
(973) 379-4200

589 Eighth Avenue-21st Floor
New York, NY 10018
(212) 596-7656
amoskowitz@lawjw.com

Attorneys for Plaintiff Sarah Gillman